# United States Court of Appeals
## For the First Circuit

No. 08-1130

COMMONWEALTH LAND TITLE INSURANCE CO.,

Plaintiff, Appellant,

v.

IDC PROPERTIES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, District Judge]

Before

Lynch, Chief Judge,
Boudin, Circuit Judge,
and Schwarzer,* District Judge.

Thomas C. Angelone with whom Thomas Gonnella and Pannone Lopes
& Devereaux LLC were on brief for appellant.
Steven E. Snow with whom Robert K. Taylor and Partridge Snow
& Hahn LLP were on brief for appellee.

November 5, 2008

*Of the Northern District of California, sitting by designation.

**SCHWARZER, <u>District Judge</u>.**  IDC Properties, Inc. ("IDC") appeals the judgment declaring the title insurance policy issued by Commonwealth Land Title Insurance Company ("Commonwealth") null and void because of material misrepresentations by IDC.  On this appeal, IDC argues that the district court applied the wrong legal standard for material misrepresentation.  Finding that the district court applied the correct standard, we affirm.

## I.   FACTUAL AND PROCEDURAL HISTORY

We provide a summary of the relevant facts which are described in detail in decisions by the district court and Rhode Island Supreme Court.  <u>See</u> <u>Commonwealth Land Title Ins. Co.</u> v. <u>IDC Props., Inc.</u>, 524 F. Supp. 2d 155 (D.R.I. 2007); <u>America Condo. Ass'n, Inc.</u> v. <u>IDC, Inc.</u>, 844 A.2d 117 (R.I. 2004) ("<u>America Condo. I</u>"), *clarified and aff'd on reargument*, 870 A.2d 434 (R.I. 2005) ("<u>America Condo. II</u>").

### A.  Master Declaration

In January 1988, IDC's predecessor, Globe Manufacturing Co. ("Globe"), owned twenty-three acres of land on Goat Island, in Newport, Rhode Island, which it planned to develop into a condominium called "Goat Island South - A Waterfront Condominium." Globe recorded a condominium declaration dividing the property into six parcels: three parcels that were existing residential complexes (America Condominium, Capella South Condominium, and Harbor House

Condominium),[1] two undeveloped parcels (the West and South Units), and another undeveloped parcel known as the "Reserved Area" (later, the North Unit). In March 1988, Globe recorded a First Amended and Restated Declaration of Condominium (the "Master Declaration"). Five of the six parcels, all except the Reserved Area, were designated "Master Units."

The Master Declaration created a Master Association to govern Goat Island South. The Master Association was controlled by a Master Executive Board comprised of representatives from each Master Unit. America, Capella South, and Harbor House were defined as "sub-condominiums," each with its own Sub-Association that was controlled by its respective Sub-Association Executive Board. See App. Ex. 7 at §§ 1.32-1.35; America I, 844 A.2d at 121-22. Members of each Sub-Association Executive Board sat on the Master Executive Board, acting as representatives for the individual sub-condominium unit owners (i.e., the residents). As owner of the West Unit, South Unit, and the majority of the individual residential units in America, Capella South, and Harbor House, IDC controlled the majority of votes on the Master Executive Board. America I, 844 A.2d at 122.

The Master Declaration reserved the Declarant's (IDC's) right to develop the West Unit and convert the Reserved Area into

_____

[1] America and Capella South each contained an apartment building and Harbor House contained nineteen stand-alone waterfront homes. America I, 844 A.2d at 120.

-3-

a Master Unit and develop it through December 31, 1994.  See App. Ex. 7 at Art. 6; America II, 870 A.2d at 440.  It also reserved the Declarant's right to improve the Master Units without any deadline and the "unrestricted right, without the consent of the Owners or Sub-Association Board Members or the Master Executive Board, to construct, renovate, sell, assign, mortgage or lease any of the Master Units or Units" owned by the Declarant.  See App. Ex. 7 at §§ 10.2, 2.3.  An "Owner" is defined as the Declarant or other person owning a Master Unit that is not a sub-condominium.  See App. Ex. 7  at § 1.27.

The Master Declaration stated that except as otherwise provided in the Master Declaration or the Rhode Island Condominium Act ("Condominium Act"), R.I. Gen. Laws §§ 34-36.1-1.01 to 4.20, amendments to the Master Declaration could only be made with the approval of 67% of the voting interest of all Owners and Sub-Association Executive Board Members.  See App. Ex. 7 at § 10.1. The Master Declaration further provided that an amendment changing any Master Unit or Master Common Elements must be approved by all Owners and Sub-Association Executive Board members of the affected Master Units.  See id.

In sum, under the Master Declaration, only owners of the undeveloped West and South Master Units and representatives of the three residential Master Units could vote to amend the Declaration, not individual unit owners of America, Capella South, or Harbor

-4-

House.  The Condominium Act, however, requires unanimous consent of the individual unit owners for amendments that "create or increase special declarant rights, increase the number of units, change the boundaries of any unit, the allocated interests of a unit, or the uses to which any unit is restricted."  R.I. Gen. Laws § 34-36.1-2.17(d).  Timothy More, IDC's counsel, stated in a memorandum to Thomas Roos, IDC's president, that "an argument could be made that the master unit structure of Goat Island, which allowed the Declarant [(IDC)] to maintain control of all Master Unit votes," circumvented this requirement.  See App. Ex. 17.

By the end of 1994, the Reserved Area had not been converted to a Master Unit and it remained undeveloped along with the West Unit.  With the expiration of its development rights looming, IDC attempted to extend the December 31, 1994, deadline through a series of amendments to the Master Declaration purportedly adopted between April and December 29, 1994.[2]  The amendments initially extended the deadline for five years to December 31, 1999, then extended it an additional sixteen years to December 31, 2015.  The Third, Fourth, and Fifth Amendments were approved by more than 67% of the voting interest as prescribed by the Master Declaration, but not by all of the individual unit owners.  IDC converted the Reserved Area to a Master Unit called

---

[2]  The Third Amendment was adopted April 29, 1994; the Fourth Amendment on November 15, 1994; and the Fifth and Sixth Amendments on December 29, 1994.

-5-

the "North Unit" through its unilateral adoption of the Sixth Amendment.

Before the Third Amendment was adopted, IDC's president (Roos) was advised by counsel to IDC's predecessor that extending the time for exercising development rights "could easily subject [IDC] to litigation" on the ground that all individual condominium owners had not consented as required under the Condominium Act. See App. Ex. 14. But because IDC considered it likely that unanimous consent of all unit owners was "impossible to obtain," a decision was made to assume an "aggressive posture." See id.

## B. Title Insurance

On October 21, 1994, after the Third Amendment had been adopted, IDC obtained a $10 million title insurance policy from Chicago Title Insurance Company ("Chicago Title") covering IDC's title and development rights in the West and South Units as well as individual condominium units still owned by IDC. App. Ex. 12. The policy did not cover the Reserved Area, later the North Unit. Both Chicago Title and IDC's counsel (More) recognized that the Third Amendment's purported extension of IDC's time to exercise its development rights might be invalid because it was not approved by all individual unit owners. See App. Ex. 13.

America, Capella South, and Harbor House each had a governing condominium association of which all unit owners were members. See App. Ex. 30 at ¶¶ 4-6. Sometime in 1997, these three

associations ("Associations")[3] and individual unit owners challenged IDC's right to develop the undeveloped Master Units claiming that the time to exercise those development rights had expired and the purported extensions of those rights were invalid. Beginning in September 1997, several meetings were held involving More, Roos, various individual owners, and the attorney for the Associations. See App. Exs. 15, 17. In a memorandum dated October 9, 1997, More expressed to Roos his concerns that (1) the extension of the Declarant's rights required unanimous consent of all unit owners and the voting structure may have circumvented the Condominium Act's requirements; and (2) the Declarant's "endless right" to construct improvements circumvented the Condominium Act and was inconsistent with other provisions of the Master Declaration. See App. Ex. 17.

Meanwhile, More was attempting to persuade Chicago Title or Commonwealth to issue a policy insuring title to and development rights in the North Unit, which was not covered by the earlier Chicago Title policy. More sent to Michael Mellion of Commonwealth copies of the Master Declaration, Amendments 1-6, the earlier Chicago Title policy, and a memorandum dated November 17, 1997, stating two theories on which IDC's claim to development rights in the North Unit was based. See App. Ex. 20.

---

[3] It is unclear whether the Associations that sued IDC in state court are the Sub-Associations defined in the Master Declaration.

The first theory was that the Fifth Amendment, which extended the time for exercising the development rights until 2015, was adopted by unanimous consent of the Master Unit Owners and that consent of the individual sub-condominium owners was not required. Id. The memo also stated that, even if the Amendment was invalid, the one-year statute of limitations should bar any challenge to it. Id. The second theory was that under specific provisions of the Master Declaration, as owner of the North Unit, IDC had the right to develop it at any time.

The November 17th memo failed to mention that one of the Executive Board Members who represented America Condominium objected to amending the declaration or extending the development rights and abstained from voting in what he deemed an illegal proceeding. 524 F. Supp. 2d at 159-60; America I, 844 A.2d at 124-25. The November 17th memo also did not refer to the threat of suit from the Associations or individual unit owners. An earlier draft of the November 17th memo, that was not sent to Commonwealth, however, referred to questions regarding the validity of the Amendment and other legal issues raised by the America Condominium association. See App. Ex. 19; Ex. 40 at 257-61.

While its December 4, 1997, request to Commonwealth was pending, IDC's discussions with the Associations continued, including negotiation of a mediation proposal to avoid "the litigation that otherwise would be inevitable" and a tolling

agreement. App. Ex. 21 (letter of Dec. 10, 1997). On January 5, 1998, IDC entered into a tolling agreement with the Associations, which provided that any suit filed by the Associations on or before June 30, 1998, would be deemed filed on December 1, 1997, "for purposes of statute of limitations" or other "similar defenses."[4] App. Ex. 25. IDC concedes that its counsel More was aware of the threat of litigation and the tolling agreement even before Commonwealth issued the title insurance policy. Appellant Br. 41 n.25. "At no time did IDC disclose to Commonwealth that individual condominium owners had threatened a suit challenging IDC's development rights or that there was a tolling agreement extending the time for bringing such a suit." 524 F. Supp. 2d at 160.

On December 12, 1997, Commonwealth offered to issue a $5 million policy insuring IDC's title to and development rights in the North Unit. App. Ex. 22.

On December 15, 1997, Chicago Title declined to issue title insurance for IDC's development rights in the North Unit. App. Ex. 23. In its rejection memo, Chicago Title disagreed with IDC's statements in the November 17th memo that it was "clear" that

---

[4] The district court incorrectly notes that the tolling agreement was entered on December 10, 1997. 524 F. Supp. 2d at 160. The Associations' December 10th letter to More included a proposed tolling agreement, App. Ex. 21, but the parties did not execute the tolling agreement until January 5, 1998. App. Ex. 25. The tolling agreement was subsequently extended three times to apply to actions filed on or before May 31, 1999. America I, 844 A.2d at 125, 134.

the Master Unit owners were the proper parties to vote on the Amendment. Id. Chicago Title stated that it was aware of "threatened litigation" and was concerned "that there is a substantial risk that the sub-condominium unit owners may allege that there was fraud in the manner in which this amendment was created." Id. Chicago Title also expressed its opinion that IDC's development rights expired on December 31, 1994. IDC did not provide Commonwealth with a copy of Chicago Title's memo or disclose the stated reasons for its rejection. 524 F. Supp. 2d at 160.

On January 13, 1998, Commonwealth issued title insurance policy number 228716 ("Policy"), covering IDC's title to the North Unit and its rights to develop and construct improvements on the North Unit. IDC then began constructing a function center known as the Regatta Club on the North Unit. On February 7, 1998, at IDC's request, Commonwealth increased the Policy from $7 million to $12 million and added title coverage for the South and West Units. See App. Ex. 28.

## C. Litigation

Before the expiration of the tolling agreement, on May 29, 1999, the Associations sued IDC and Roos in Rhode Island state court seeking a declaration that IDC's development rights had expired on December 31, 1994, and that IDC no longer owned the North Unit or any other undeveloped Master Unit. In June 2001, the

Superior Court entered judgment for the Associations, declaring that "IDC's development rights expired on December 31, 1994 because the amendments purporting to extend the time for exercising them were not unanimously approved by individual unit owners."  524 F. Supp. 2d at 160.

While IDC's appeal to the Rhode Island Supreme Court was pending, Commonwealth filed this declaratory judgment action on August 24, 2001.  Commonwealth sought declarations that any losses resulting from the annulment or expiration of IDC's development rights were excluded from coverage under the Policy, that Commonwealth was not liable to IDC for any such losses, and that the Policy provides no coverage for IDC's title.[5]  The district court concluded that Commonwealth based its case on IDC's failure to disclose material facts.  524 F. Supp. 2d at 161.  IDC counterclaimed seeking a declaration that the Policy does cover the loss of IDC's development rights and its title.  This action was stayed pending resolution of IDC's appeal to the Rhode Island Supreme Court.

In March 2004, the Rhode Island Supreme Court held that (1) the amendments extending the time for IDC's development rights were void because they were not unanimously approved by the

_____

[5]  The district court granted Commonwealth's motion to amend its complaint to specifically request a declaration that the Policy provides no coverage for IDC's title.  524 F. Supp. 2d at 165-66. IDC does not challenge this on appeal.

-11-

individual unit owners; (2) IDC's development rights expired on December 31, 1994; and (3) title to the North, South, and West Units vested in the individual unit owners. America I, 844 A.2d at 130-33. After reargument, the Rhode Island Supreme Court reaffirmed and clarified its first decision, holding that the North, South, and West Units were never validly created because they did not comply with the substantial completion requirement of the Condominium Act. America II, 870 A.2d at 440-42.

After the second Rhode Island Supreme Court decision, the district court conducted a three day bench trial and issued its decision on December 21, 2007, from which IDC appeals.

## II. ANALYSIS

Following a bench trial, "we review the district court's legal conclusions de novo and its underlying factual findings for clear error." Federal Ins. Co. v. HPSC, Inc., 480 F.3d 26, 34 (1st Cir. 2007) (citing Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000)); see Fed. R. Civ. P. 52(a). We have subject matter jurisdiction under 28 U.S.C. § 1332 and appellate jurisdiction under 28 U.S.C. § 1291.

The central issue on appeal is whether the district court applied the correct standard for material misrepresentation.[6] IDC does not challenge any of the district court's factual findings,

---

[6] In view of our disposition of this appeal, we need not reach Commonwealth's policy exclusion argument.

including its findings of materiality and misrepresentation.

## A. District Court Opinion

The district court held that under Rhode Island law, a material misrepresentation or omission in an insurance application makes the insurance policy voidable and "need not be made with fraudulent intent." 524 F. Supp. 2d at 162-63. The district court treated the failure to disclose material facts as an affirmative misrepresentation, which IDC does not challenge. Id. at 162; see Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 3.01[b] (14th ed. 2008). It found that IDC "knowingly failed to disclose" to Commonwealth that (1) individual condominium unit owners had threatened a suit challenging IDC's claimed development rights; (2) IDC had entered a tolling agreement with the unit owners extending the time for bringing such a suit; and (3) Chicago Title had cited the litigation threat as one of its reasons for declining to provide coverage. 524 F. Supp. 2d at 162-63. Commonwealth was not aware of any of these facts and they were not matters of public record. Id. at 163.

The evidence showed that IDC's president (Roos) and counsel (More) participated in meetings with the Associations and individual unit owners where the challenge to IDC's development rights in the North Unit and the litigation threat were specifically discussed. Id. at 163. The district court found that Roos and More recognized that the challenge might succeed,

-13-

demonstrated by More's October 9th memo to Roos and IDC's decision to enter the tolling agreement to "settle or delay the litigation until after the [title] insurance had been obtained." Id. In his October 9th memo to Roos, More expressed concern that IDC's development and construction rights could be found to "circumvent[]" time limitations under the Condominium Act and the Master Declaration. 524 F. Supp. 2d at 165; App. Ex. 17.

The district court found, moreover, that the November 17th memo, which More sent to Commonwealth with IDC's request for title insurance, did not mention the individual unit owners' challenge to the amendments or "IDC's own assessment" that unanimous consent of all individual unit owners was required to extend the time to exercise IDC's rights. 524 F. Supp. 2d at 163. The district court determined that the omitted assessment was inconsistent with one of the theories advanced in the November 17th memo on which IDC's claim to development rights in the North Unit was based. Id. The district court also found the November 17th memo failed to disclose that one of the Executive Board Members objected to amending the declaration or extending the development rights and abstained from voting in what he deemed an illegal proceeding. Id. at 159-60. This Executive Board Member represented America Condominium. America I, 844 A.2d at 124-25. The November 17th memo further stated that, even if the Amendment was invalid, the one-year statute of limitations should bar any

-14-

challenge to it. 524 F. Supp. 2d at 160. Commonwealth was not aware of the tolling agreement, which (1) IDC negotiated and executed before the Policy issued, (2) IDC failed to disclose, and (3) was not a matter of public record. See id. at 163-64, 160.

The district court found that the litigation threat, tolling agreement, and substance of Chicago Title's refusal were material because Commonwealth would not have issued the Policy if they were disclosed and they "bore directly on the nature of the risk that Commonwealth was being asked to insure." 524 F. Supp. 2d at 162-63. The district court determined that the threat of litigation alone was material to Commonwealth's decision because it "was real and it directly related to a risk covered by the Policy." Id. at 163.

The evidence showed that Commonwealth would not have issued the policy had it known these facts. Mellion, who made Commonwealth's decision to issue the Policy, "explained that, because the Policy required Commonwealth to defend against any claims challenging IDC's insured interests[] and, because the policy premium of approximately $5,000 would have covered only a fraction of the cost of defending against litigation brought by the individual unit owners, Commonwealth would have declined to issue the Policy since it was not interested in 'buying a lawsuit.'" Id. IDC does not challenge the district court's finding of materiality.

The district court held the Policy to be void based on

IDC's material nondisclosures and entered judgment in favor of Commonwealth on both its claim and IDC's counterclaim. 524 F. Supp. 2d at 162-63, 165, 166. Having found that the Policy was void, the district court declined to reach Commonwealth's claims that IDC's losses resulting from the annulment or expiration of its development rights were excluded from coverage under the Policy. Id. at 162.

**B. Applicable Standard**

Rhode Island law governs this diversity case where the parties[7] and district court applied it and choice of law is not at issue. See Hershey v. Donaldson, Lufkin & Jenrette Securities Corp., 317 F.3d 16, 20 (1st Cir. 2003) ("Where parties have agreed to the choice of law, this court is free to 'forego an independent analysis and accept the parties' agreement.'"); Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) (applying Rhode Island law for claims where the parties and district court consistently did).

On appeal, IDC does not challenge the district court's finding that the information it failed to disclose was material. Rather, it argues that, absent fraud (which the district court did not find), there is no obligation to disclose information to a prospective insurer unless specifically asked questions on the

---

[7] At oral argument, IDC confirmed that Rhode Island law was controlling.

point.  Thus, IDC contends, the legal standard applied by the district court was incorrect and the court erred in stating that material omissions, as opposed to misrepresentations, were sufficient to void the title insurance policy absent fraud.

Rules vary--even among different types of insurance--as to whether there is a duty to disclose material facts to an insurer absent a question, and Rhode Island law may not provide a clear answer as to that question as to policies of the kind here involved.  But we need not decide how the Rhode Island courts would resolve a bare non-disclosure issue because it is clear that a half-truth or failure to speak when necessary to qualify misleading prior statements does amount to a misrepresentation.  See Nash v. Trustees of Boston Univ., 776 F. Supp. 73, 83 (D.R.I. 1990), aff'd, 946 F.2d 960 (1st Cir. 1991); Restatement of Torts § 529 (1938); see also Halpert v. Rosenthal, 267 A.2d 730, 734 (R.I. 1970) (defining "misrepresentation" as "any manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts.").

Here, IDC made affirmative representations about the subjects at issue.  For example, More sent the November 17th memo stating two theories on which the development rights in the North Unit were based, but he deleted information about the legal issues raised by the American Condominium association and did not include

-17-

information about the threatened lawsuit. Further, IDC failed to clarify that its statements, that any claim challenging its development rights would be barred by the statute of limitations, were affected by the tolling agreement IDC entered with the Associations before Commonwealth issued the Policy. Also, in an effort to persuade Commonwealth to issue the title insurance policy, More sent Commonwealth the earlier Chicago Title insurance policy but later failed to disclose when Chicago Title refused to issue a new policy based on the threatened litigation. A prospective insured cannot select and present only favorable information on a subject and delete less favorable information on the same point, even if no follow up questions are asked.

Finally, having concluded that IDC made material misrepresentations to Commonwealth, we need not resolve whether the district court's finding that IDC "knowingly failed to disclose" material information amounted to a finding of fraud. Rhode Island law is clear that, in the case of a material misrepresentation, fraud is not required to void a policy. Evora v. Henry, 559 A.2d 1038, 1040 (R.I. 1989); Guardian Life Ins. Co. of Am. v. Tillinghast, 512 A.2d 855, 859 (R.I. 1986); see also Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 38 (1st Cir. 2006).

We therefore hold that the district court applied the correct standard and affirm.

Affirmed.

-18-