Judge CUFF
(temporarily assigned) delivered the opinion of the Court.
In this appeal, we consider whether the Rhode Island Medical Malpractice Joint Underwriting Association (RIJUA) must defend and indemnify a podiatrist in a medical malpractice action pending in New Jersey following rescission of the podiatrist’s medical malpractice liability policy. The policy had been rescinded due to material misrepresentations concerning the state in which the insured podiatrist maintained his primary practice. The trial court and the Appellate Division, applying New Jersey law, held that in a medical malpractice action pending in this State, the insurer had the duty to defend and indemnify the insured podiatrist up to $1 million, the amount of professional liability insurance physicians and podiatrists are required to maintain in this State.
We granted leave to appeal, and now reverse. The critical inquiry in this case is whether a rescinded policy of medical malpractice liability insurance provides any coverage to the insured for claims that arose prior to rescission. Although the Appellate Division correctly determined that New Jersey law applies, we conclude that the Appellate Division erred when it referred to the compulsory automobile liability model as the guidepost for fashioning a remedy for third-party claimants whose *367 claims arose prior to rescission. The appellate panel further erred by reforming the rescinded policy to require the insurer to defend and indemnify its insured up to the mandatory minimum amount of coverage required in this State.
We conclude that resolution of the question of what, if any, coverage is available to an insured to respond to third-party claims following rescission of a policy is governed by the rule announced in First American Title Insurance Co. v. Lawson, 177 N.J. 125, 827 A.2d 230 (2003), and its progeny. Applying that rule, the RIJUA owed neither a duty to defend nor a duty to indemnify its insured, who had misrepresented the proportion of his practice generated in Rhode Island, which was a fact that formed the basis for his eligibility for insurance through the RIJUA. We therefore reverse the judgment of the Appellate Division.
I.
Plaintiff Thomas DeMarco, a New Jersey resident, sought treatment for chronic plantar fasciitis from defendant Sean Robert Stoddard, D.P.M. Dr. Stoddard practiced podiatry at the Center for Advanced Foot & Ankle Care, Inc., which had offices in Toms River and Lakewood. Dr. Stoddard diagnosed DeMarco with a split peroneal tendon and performed three surgical procedures on DeMarco between 2004 and January 2011. The third surgery, which forms the basis of DeMarco’s complaint, occurred in September 2010.
In 2007, Dr. Stoddard applied to the RIJUA for medical malpractice liability insurance. He submitted his application through Linda O’Neill, an agent located in Rhode Island. The application listed Dr. Stoddard’s office at a Rhode Island address, but the office phone number had a New Jersey area code. The application also provided that Dr. Stoddard was “currently applying” for affiliation with a Rhode Island hospital. The “Licensure” section of the application asked whether at least fifty-one percent of the applicant’s practice was generated in Rhode Island. The application had “Yes” checked off, but that answer was false. The *368 application then stated, partly in bold letters: “IF YOUR ANSWER IS NO, DO NOT CONTINUE. You are not eligible for coverage under the Rhode Island MMJUA.” The agent claims that Dr. Stoddard provided all of the information required in his initial application.
Through the same Rhode Island agent, Dr. Stoddard submitted renewal applications each year from 2008 through 2011. Each of the renewal forms stated that at least fifty-one percent of Dr. ' Stoddard’s practice was generated in Rhode Island. In addition, the renewal application for the 2010-2011 coverage year — when Dr. Stoddard performed the surgery that forms the basis of DeMarco’s malpractice claim — listed an office address in Lakewood.
In January 2011, Dr. Stoddard told DeMarco that he was moving to California. DeMarco’s condition worsened, and he sought treatment from an orthopedic surgeon. The surgeon performed two additional surgeries on DeMarco.
In October 2011, DeMarco and his wife, Cynthia DeMarco (the DeMarcos) filed a medical malpractice complaint in New Jersey against Dr. Stoddard and the Center for Advanced Foot & Ankle Care, Inc., alleging that Dr. Stoddard negligently performed the September 2010 surgery. Dr. Stoddard forwarded the DeMarcos’ complaint to the RIJUA, which responded with a reservation of rights letter. The letter indicated that the RIJUA only provides coverage for physicians who maintain fifty-one percent of their “professional time and efforts” in Rhode Island and that the RIJUA was “in the process of securing facts concerning whether [Dr. Stoddard] ... met the fifty-one percent (51%) requirement for the provision of insurance coverage from the [RI]JUA.”
Less than a week later, Dr. Stoddard wrote a letter to the attorney representing the DeMarcos, advising that he “has no malpractice coverage in regards to [their] claim.” Dr. Stoddard also stated that he tried to build his practice in Rhode Island but failed and that an agent told him he could enroll with the RIJUA even though the bulk of his practice was in New Jersey. Addi *369 tionally, Dr. Stoddard stated that he had no assets, his new practice — a professional corporation in California — was struggling, he was in the midst of a divorce, he had defaulted on his student loans, and he had “a significant amount of debt.” Dr. Stoddard conceded that he could not prove that he satisfied the RIJUA’s fifty-one percent requirement, and stated that “it would be a waste of time to pursue this claim against me based on these facts.”
II.
In January 2012, the RIJUA filed a complaint for a declaratory judgment in Rhode Island, naming both Dr. Stoddard and the DeMarcos as defendants. The RIJUA sought a judgment declaring that Dr. Stoddard misrepresented material information in his four applications to the RIJUA. It also sought a judgment permitting rescission of the policy. In February 2012, the DeMarcos’ attorney sent a letter to the RIJUA’s general counsel, indicating that he did not believe his clients were subject to personal jurisdiction in Rhode Island.
In March 2012, the DeMarcos amended their medical malpractice complaint. They added the RIJUA as a defendant and sought a declaratory judgment that the RIJUA was required to defend Dr. Stoddard and indemnify him up to $1 million in the event that the DeMarcos were awarded damages for their claims against Dr. Stoddard.
In May 2012, the Rhode Island court entered a default judgment against Dr. Stoddard, declaring his renewal policy from 2010 to 2011 void and holding that the RIJUA had no duty to defend or indemnify Dr. Stoddard for the DeMarcos’ claims.
Thereafter, the RIJUA and the DeMarcos filed cross-motions for summary judgment in the New Jersey malpractice case. The motions addressed whether the RIJUA was required to defend and indemnify Dr. Stoddard and the effect of the default judgment in Rhode Island against Dr. Stoddard. The trial court applied a choice of law analysis and determined that New Jersey law should apply. The court held that the Rhode Island judgment was not *370 entitled to full faith and credit and could not be enforced in the New Jersey action because it was entered without jurisdiction over the DeMarcos. Finally, the trial court denied the RIJUA’s motion for summary judgment and granted the DeMarcos’ motion, concluding that the DeMarcos were entitled to summary judgment “because compulsory insurance cannot be voided as to an innocent third party.” The court also awarded the DeMarcos attorneys’ fees for successfully litigating the RIJUA’s disclaimer of coverage.
The Appellate Division granted the RIJUA’s motion for leave to appeal. In a published opinion, DeMarco v. Stoddard, 434 N.J.Super. 352, 84 A.3d 965 (App.Div.2014), the Appellate Division affirmed the trial court order.
The Appellate Division determined that “[t]he precise question before us is whether a medical malpractice insurance carrier may rescind a policy so that the carrier has no duty to indemnify the insured doctor for injuries suffered by an innocent third party who made a malpractice claim before the policy was rescinded.” Id. at 367, 84 A.3d 965. The panel predicted that this State would permit rescission of a compulsory medical malpractice liability insurance policy due to misrepresentations of material facts in the policy application but would protect an innocent third party, such as a patient whose claim arose prior to rescission, up to the minimum amount of required coverage. Ibid. The panel also determined that Rhode Island might protect innocent third parties. Ibid.
In addition, the panel concluded that “[ajnalogous case law of both states suggests that both would restrict the rescission remedy ... in order to provide some protection to innocent third parties for whose benefit compulsory insurance laws were enacted.” Ibid. In reaching this conclusion, the panel compared medical malpractice liability insurance to the protection afforded to innocent third parties when a motor vehicle liability insurance policy has been rescinded. Id. at 368-73, 84 A.3d 965. The Appellate Division determined, however, that Rhode Island had “not directly compelled coverage in any specific amount,” while *371 New Jersey requires $1 million of coverage, necessitating a choice-of-law analysis. Id. at 373-74, 84 A.3d 965. The Appellate Division determined that New Jersey law should apply and concluded that innocent third parties should be protected for a claim arising before rescission. Id. at 380, 84 A.3d 965. Applying that rule to plaintiffs, the panel concluded that the RIJUA owed a duty to indemnify Dr. Stoddard up to $1 million, the amount of medical malpractice liability insurance that a physician licensed to practice medicine and performing medical services in this State is required to maintain, even though the record demonstrated that Dr. Stoddard provided materially false information to the RIJUA in his applications for insurance coverage. Ibid.
We granted the RIJUA’s motion for leave to appeal. 218 N.J. 270, 94 A.3d 908 (2014). We also granted motions to appear as amicus uriae by five entities: New Jersey Civil Justice Institute (NJCJI), New Jersey Physicians United Reciprocal Exchange (NJPURE), Property Casualty Insurers Association of America (Property Casualty Insurers), Insurance Council of New Jersey (Insurance Council), and New Jersey Association for Justice (NJAJ).
III.
A.
The RIJUA raises three points of error in the Appellate Division’s decision. First, it argues that Rhode Island law should apply to the coverage dispute. Although the RIJUA agrees that Rhode Island and New Jersey law conflict, it disputes that a conflict of law analysis results in the application of New Jersey law. In particular, the RIJUA argues that the Appellate Division erroneously viewed the coverage dispute as a first-party claim by the DeMarcos against the RIJUA. Instead, the RIJUA submits that the dispute consisted of a third-party claim by the DeMarcos, which addressed whether the RIJUA must defend and indemnify Dr. Stoddard in response to their claims. Accordingly, the RI- *372 JUA maintains that the Appellate Division focused on the DeMarcos’ interests when it should have focused on the interests of the parties to the insurance contract — the RIJUA and Dr. Stoddard. The RIJUA thus argues that consideration of those interests would have led to the proper conclusion that Rhode Island law applies.
Second, the RIJUA argues that the reformation remedy fashioned by the Appellate Division was inequitable under New Jersey law. Citing the dissent in Citizens United Reciprocal Exchange v. Perez (CURE), 432 N.J.Super. 526, 538, 75 A.3d 1233 (App.Div. 2013), rav’d, 223 N.J. 143, 121 A.3d 374 (2015), the RIJUA asserts that while courts must protect innocent third parties, they must also provide some relief to the defrauded insurance provider. Under the Appellate Division judgment, even though the policy is void due to Dr. Stoddard’s misrepresentations, the RIJUA is made liable for the same amount of coverage — $1 million — as it would if the policy was valid. In other words, the RIJUA argues that the Appellate Division’s decision is inequitable because it failed to provide any relief whatsoever to the RIJUA. It also states that such a result fails to provide any disincentive for an applicant to lie to an insurance provider.
The RIJUA also contends that “mandatory [professional] malpractice coverage can and will be voided, in full and ab initio, as a result of fraud in the application by an insured.” In particular, the RIJUA relies on Lawson, supra, 177 N.J. 125, 827 A.2d 230.
Last, the RIJUA argues that attorneys’ fees were improperly awarded to the DeMarcos under Rule 4:42-9(a) because its position was not a “groundless disclaimer” of coverage.
B.
The DeMarcos argue that this case does not present a significant conflict of law issue because both New Jersey and Rhode Island have laws requiring compulsory medical malpractice insurance and both states protect innocent third parties seeking to recover under a statutorily mandated insurance policy. Neverthe *373 less, the DeMarcos assert that the Appellate Division resolved the conflict of law question correctly by ruling that New Jersey law applied.
Additionally, the DeMarcos assert that the Appellate Division decision was fair and equitable. Plaintiffs contend that the RI-JUA was in a better position to detect Dr. Stoddard’s misrepresentations and reject his renewal applications. Accordingly, they contend it would not be equitable to force the DeMarcos to bear the loss.
The DeMarcos also assert that the Appellate Division’s determination is consistent with New Jersey law. They contend that it is universally recognized that an insurer cannot escape liability to a third party even if the insured procured coverage through fraud or misrepresentation. The DeMarcos distinguish Lawson on the grounds that the insured party here is a private citizen, as opposed to an insurance company. Moreover, the misrepresentation in Lawson related to a presently existing claim against the law firm, whereas the misrepresentation in this case related to the likelihood of potential future claims arising outside of Rhode Island. They assert that the RIJUA knew that Dr. Stoddard could potentially face a claim outside of Rhode Island, as the policy only required fifty-one percent of the practice to be in Rhode Island. Therefore, the RIJUA knowingly assumed the risk that it might become involved in litigation in New Jersey. In contrast, the DeMarcos contend that the misrepresentation in Lawson induced an agreement by concealing a risk unknown to the insurer.
Finally, the DeMarcos assert that the trial court properly awarded attorneys’ fees.
C.
Amici NJCJI, NJPURE, Property Casualty Insurers, and Insurance Council urge reversal of the Appellate Division judgment. Each argues that the^appellate panel misperceived the breadth of the rule protecting innocent third parties following rescission of an *374 insurance policy. Each notes that compulsory automobile insurance policies occupy a unique place in the law of this State, and each emphasizes that well-established authority addressing compulsory professional liability insurance coverage permits rescission of a fraudulently induced policy with no protection to innocent third parties, such as clients or patients.
Amicus NJPURE also asserts that the appellate panel opinion “incentivizes applicants to commit fraud.” Amici Property Casualty Insurers and Insurance Council urge that the rule announced by the Appellate Division will hinder proper underwriting and diminish the availability of professional liability insurance coverage.
Amicus NJAJ urges affirmance of the Appellate Division judgment. It contends that the opinion upholds the public policy of this State to protect the rights of innocent third parties when an insurer seeks to void ab initio a policy of insurance.
IV.
A.
In New Jersey, the Legislature first instituted mandatory malpractice insurance for physicians and podiatrists in 1998. L. 1997, c. 365, § 1 (physicians); L. 1997, c. 365, § 2 (podiatrists). N.J.S.A. 45:5-5.3, which codified L. 1997, c. 365, § 2, mandates that podiatrists must obtain and maintain malpractice liability insurance, or if coverage is unavailable, a letter of credit for at least the minimum amount prescribed by the Board of Medical Examiners (BME).[1] The BME promulgated a regulation setting the minimum amount of malpractice insurance for physicians and podiatrists at $1 million per occurrence and $3 million per policy year. N.J.A.C. 13:35-6.18.
*375 In 2004, the Legislature amended L. 1997, c. 365, § 1. N.J.S.A. 45:9-19.17; L. 2004, c. 17, § 25. The 2004 amendment codified the 1999 regulation and set the minimum amount of malpractice insurance for physicians at $1 million per occurrence and $3 million per policy year. L. 2004, c. 17, § 25. Notably, the 2004 statutory amendment addressed only physicians. Nevertheless, the 1999 regulation applies to both physicians and podiatrists, and sets the floor for both at $1 million per occurrence and $3 million per policy year. N.J.A.C. 13:35-6.18. In addition, N.J.S.A. 45:9-19.17 requires physicians to maintain an insurance policy specifically “by a carrier authorized to write medical malpractice liability insurance policies in this State,” but N.J.S.A 45:5-5.3 does not include a similar requirement for podiatrists.
There is scant ease law interpreting the statutes and regulations requiring physicians and podiatrists to obtain and maintain medical malpractice liability insurance. In Jarrell v. Kaul, 223 N.J. 294, 297,123 A.3d 1022 (2015), the Court reviewed the compulsory medical malpractice liability insurance scheme adopted by the Legislature in the context of a multi-count complaint filed by a patient injured by a physician who did not have the statutorily mandated medical malpractice liability coverage. Only one of the issues before the Court in Jarrell implicated the consequences to a patient with a pending negligence claim when a policy is rescinded. Ibid. The Court opined that the statute requiring a physician practicing medicine in this State to obtain and maintain medical malpractice liability insurance does not give rise to a direct cause of action by an injured patient to enforce that requirement. Id. at 309-10, 123 A.3d 1022. The only other case addressing the consequences to an injured third party due to the absence of medical malpractice liability insurance is the opinion under review.
In the context of compulsory legal malpractice insurance,[2] however, there is a well-developed body of law holding that a legal malpractice insurance policy may be declared void from its incep *376 tion due to a misrepresentation of material fact by the insured in an application for insurance. Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 446-49, 916 A.2d 440 (2007); Lawson, supra, 177 N.J. at 129, 827 A.2d 230. Upon rescission, the insurer owes no duty to defend or indemnify the law firm or any defalcating attorney of the firm for any complaints pending or claims that accrued at the time of rescission. Lawson, supra, 177 N.J. at 129, 827 A.2d 230.
In Lawson, one of three members of a law firm applied for professional liability insurance for the firm and its members. Id. at 131, 827 A.2d 230. At the time, the member had been engaged in a scheme in which he improperly transferred funds between client accounts and the firm business account to meet the firm’s financial obligations. Id. at 130-31, 827 A.2d 230. A second member of the firm had previously discovered the scheme but took no action to cease the practice. Ibid. In the insurance application, the member who initiated the scheme falsely stated that he knew of no “acts, errors or omissions in professional services that may reasonably be expected to be the basis of a professional liability claim,” and warranted that all information in the application was accurate. Id. at 131, 827 A.2d 230. At about the same time, the Office of Attorney Ethics (OAE), acting on three grievances filed against the firm, notified the firm that it would conduct an audit. Id. at 132, 827 A.2d 230. The attorney who had filed the original application later provided a new warranty as to the accuracy of the information in the application. Ibid.[3]
*377 As a result of numerous improper transfers, title insurers that paid claims to various individuals represented by the firm sought recovery against the firm and its members, who in turn sought coverage from their professional liability insurer. Id. at 132-33, 827 A.2d 230. The insurer obtained a declaratory judgment allowing it to rescind coverage in respect to the two defalcating members but not the third member or the firm. Id. at 134, 827 A.2d 230. In reviewing this judgment,[4] this Court held that the insurer had “the clear right to rescind [a defalcating attorney’s] coverage in the face of his blatant and direct misrepresentations.” Id. at 140, 827 A.2d 230. The Court expressly rejected the contention of the title insurers — injured third parties — that the remedy for such misrepresentations should only be prospective rescission of the policy. Ibid,. In doing so, the Court recognized that two of the firm’s three attorneys would be without insurance coverage to respond to malpractice claims filed against them by injured clients and the title insurer. Id. at 143, 827 A.2d 230. The Court reasoned that the harsh result was warranted because “[permitting the ... coverage to survive [the member’s] defalcations would, in essence, condone ... fraudulent conduct.” Id. at 141, 827 A.2d 230.
Later, in Liberty Surplus Insurance, supra, this Court upheld the entry of summary judgment in favor of the insurer in a declaratory judgment action seeking rescission ab initio of a legal malpractice liability insurance policy due to misrepresentations of material fact in the policy application. 189 N.J. at 450, 916 A.2d 440. The firm therefore faced the legal malpractice claim filed by the injured client without coverage. Ibid.; see also Liebling v. Garden State Indem., 337 N.J.Super. 447, 450-51, 767 A.2d 515 (App.Div.) (affirming summary judgment rescinding legal malpractice policy and denying coverage for professional negligence action filed and served on firm before application for and issuance of policy), certif. denied, 169 N.J. 606, 782 A.2d 424 (2001).
*378 Thus, it is well established in this State that an attorney will not have access to insurance coverage to respond to claims from injured third parties, clients, or title companies, if the professional liability insurance policy has been rescinded due to the attorney’s misrepresentations of material fact in the policy application. We discern no basis to treat other professionals required to obtain and maintain professional liability insurance, including physicians and podiatrists, in a different manner.
Rather, the same reasons that permit rescission of a legal malpractice insurance policy pertain to medical malpractice liability insurance. A policy will be issued following an analysis of the risk to be assumed. A misrepresentation of a material fact in an application undermines the risk assessment and ultimately the decision to provide coverage by an insurer. Moreover, all forms of professional liability insurance serve the same purpose — to defend when claims are filed against a professional and to serve as a source of funds to compensate injured patients or clients. Permitting reformation of a medical malpractice liability policy to conform to statutorily mandated minimum amounts also suggests that fraudulent conduct is condoned. Finally, reformation runs counter to our recent decision in Jarrell, which denied a direct action for compensation by an injured patient against an uninsured physician. Jarrell, supra, 223 N.J. at 324, 123 A.3d 1022.
B.
In reaching this determination, we also conclude that the compulsory automobile insurance model has no relevance to the remedial response to a fraudulently obtained policy of professional liability insurance and the effect of rescission on innocent third parties.
Recently, in CURE, supra, we explained that the long-established and comprehensive no-fault automobile insurance system, which is “designed to ensure that persons injured in motor vehicle accidents are compensated promptly for their injuries and financial losses,” centers on compulsory automobile liability insur *379 ance. 223 N.J. at 152, 121 A.3d 374 (internal quotations omitted). In order to preserve the benefits of that insurance, N.J.S.A. 39:6-48(a) provides that an automobile liability policy may not be “cancelled or annulled ... after the insured has become responsible for the loss or damage” to an innocent third party. Thus, a fraudulently obtained policy of insurance is subject to rescission by the insurer, but an innocent third party injured by the insured before discovery of the fraud may look to the liability coverage in place at the time of injury up to the minimum mandatory insurance required by law. Palisades Safety & Ins. Ass’n v. Bastien, 175 N.J. 144, 148-49, 814 A.2d 619 (2003); Marotta v. N.J. Auto. Full Ins. Underwriting Ass’n, 280 N.J.Super. 525, 530, 656 A.2d 20 (App.Div.1995), affd o.b., 144 N.J. 325, 676 A.2d 1064 (1996).
Our no-fault automobile liability system provides further protection to insureds. For example, any person required to obtain automobile liability insurance acquires uninsured and underinsured motorist coverage. N.J.S.A 17:28-1.1(b). Such coverage ameliorates the financial harm that may arise if a driver has no or insufficient coverage. In addition, an injured person may be able to obtain a financial recovery through the New Jersey Property-Liability Insurance Guaranty Association (PLIGA) for losses inflicted by financially irresponsible or unknown owners or operators of motor vehicles.[5] N.J.S.A. 39:6-61 to -91. An injured, insured motorist may also obtain prompt medical treatment through the personal injury protection (PIP) benefits of an individual automobile liability insurance policy. N.J.S.A. 39:6A-4. An injured person with no recourse to any insurance coverage may obtain damages for noneconomic loss, property damage, and PIP benefits through PLIGA. N.J.SA 39:6-61 to -90.1.
The web of interrelated provisions attending the no-fault automobile liability model, including the compulsory automobile liabili *380 ty provisions, may minimize the number and amount of the claims of injured third parties. Moreover, the compulsory automobile liability insurance model has created an expectation among those operating motor vehicles that every individual who may be in an accident will be insured. By contrast, the Legislature has not constructed a similar matrix of alternate remedies for any other type of liability insurance, including compulsory professional liability insurance, or created an expectation that insurance coverage will be available to redress an injury even in the face of a fraudulently obtained policy.
Furthermore, the vast differences in the amount of liability insurance that a driver and a physician must carry counsels against utilizing the compulsory automobile liability insurance model to devise a remedy for an injured patient whose physician is uninsured by virtue of a rescission. The compulsory automobile liability insurance model also does not account for the fact that some physicians may have to procure professional liability insurance through a joint underwriting association due to market forces in the place where they practice. Such associations function essentially as mandatory assigned risk pools in order to permit physicians to obtain medical malpractice insurance and to provide essential medical services to patients. In order to maintain affordable rates, some associations have amassed operating losses. See Patricia M. Danzon, Medical Malpractice: Theory, Evidence, and Public Policy 93, 112 (1985). Indeed, unlike many other states’ joint underwriting associations, the RIJUA remains in effect despite operating losses over the years. See Med. Malpractice Joint Underwriting Ass’n v. Paradis, 756 F.Supp. 669, 671 (D.R.I.1991).
For those reasons, we conclude that the Appellate Division’s reference to and reliance on the compulsory automobile liability insurance model was misplaced. Its reliance on that model also ignored this State’s longstanding rule that an insured professional cannot expect insurance coverage to respond to third-party claims when the professional liability insurance has been *381 rescinded due to misrepresentations of material fact in the application.
V.
Finally, we address the purported conflict of laws identified by the Appellate Division. The panel declared a difference in the manner in which each state addressed compulsory medical malpractice insurance and determined that the difference constituted a conflict of laws. We conclude that such a determination was unfounded. As we have explained, resolution of the issue presented in this appeal begins and ends with the judicial response to a misrepresentation of material fact on an application for professional liability insurance. In this State, a court may rescind a policy ab initio, in which case the insured is without insurance coverage to respond to a claim by a third party. Based on our research, it appears that Rhode Island courts would do the same.
Our research has identified no case in Rhode Island that has addressed the issue presented in this appeal other than the judgment entered in the declaratory judgment action commenced by the RIJUA against Dr. Stoddard. There, due to his ineligibility for coverage through the RIJUA, the trial court rescinded the policy ab initio and declared that the RIJUA owed no obligation to defend or indemnify Dr. Stoddard in the DeMarco action pending in New Jersey. This outcome is entirely consistent with well-established law in Rhode Island holding that an insurance policy is subject to rescission if the insurer was induced to insure an applicant based on a false representation of fact in the application. Evora v. Henry, 559 A.2d 1038, 1040 (R.I.1989) (rescinding fire insurance policy); The Guardian Life Ins. Co. of Am. v. Tillinghast, 512 A.2d 855, 859 (R.I.1986) (rescinding disability insurance policy). This rule applies broadly to a wide variety of insurance policies other than compulsory motor vehicle liability insurance. See, e.g., Commonwealth, Land Title Ins. Co. v. IDG Props., Inc., 547 F.3d 15, 20-23 (1st Cir.2008) (applying Rhode Island law to permit rescission of title insurance policy); Commercial Union *382 Ins. Co. v. Pesante, 459 F.3d 34, 38 (1st Cir.2006) (applying Rhode Island law to permit rescission of marine insurance policy); see also R.I. Gen. Laws § 27-18-16 (“The falsity of any statement in the application for [accident and sickness insurance policies] may not bar the right to recovery under the policy unless the false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer.” (emphasis added)).
Focusing as we have on the broader universe of insurance policies issued to protect an insured from a variety of risks, including professional liability claims, we discern that New Jersey and Rhode Island permit rescission of an insurance policy when that policy has been issued based on misrepresentations of material fact. In each situation, other than the compulsory motor vehicle liability insurance model in each state, a third party who has asserted a claim or whose claim accrued prior to rescission receives no benefit from the rescinded policy. In short, although we cannot determine with certainty that the laws of each state are in harmony on this issue, we are also in no position to declare that a conflict exists between the laws of New Jersey and Rhode Island on this issue.
Finally, to the extent that each state requires a podiatrist to maintain medical malpractice liability insurance, we discern no difference in the laws of each state that amounts to a conflict of laws. To be sure, Rhode Island adopted a statute that established minimum levels of coverage lower than those required in New Jersey. Compare R.I. Gen. Laws § 42-14.1-2 (setting minimum amounts of $100,000 per claim and $300,000 per policy year), with N.J.S.A. 45:5-5.3 and N.J.S.A. 45:9-19.17 (requiring minimum amounts of $1 million per claim and $3 million per policy year). Furthermore, the executive agency tasked with adopting regulations to implement the Rhode Island statute did not do so until Fall 2013. See 02-030-021 R.I.Code R. § 5 (requiring minimum amounts of $1 million per claim and $3 million per policy year). Indeed, the mandatory nature of such insurance remained an open *383 question as late as 2013. See Peloquin v. Haven Health Ctr. of Greenville, L.L.C., 61 A.3d 419, 429-30 (R.I.2013).
A conflict of laws however does not arise unless there is a substantive difference between or among the potentially applicable laws. Cornett v. Johnson & Johnson, 211 N.J. 362, 374, 48 A.3d 1041 (2012); P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143, 962 A.2d 453 (2008). A substantive difference between the law of one state and another exists when the difference is offensive or repugnant to the public policy of this State. Cornett, supra, 211 N.J. at 377, 48 A.3d 1041. Here, the difference cannot be considered substantive. Both states have declared that physicians and podiatrists are required to obtain and maintain medical malpractice liability insurance. Moreover, Dr. Stoddard had a policy of medical malpractice liability insurance in place at all relevant times, rendering any differences in the states’ insurance coverage requirements irrelevant. Rather, the issue presented in this case is whether an insurance policy is subject to rescission based on a false representation of fact in the insurance application. With respect to that core issue, both states agree that rescission is the appropriate remedy.
VI.
In summary, it is well established in this State that a professional who has made a misrepresentation of material fact in an application for professional liability insurance can expect that the policy may be rescinded on application of the insurer. A professional in that position can also expect that claims that arose prior to discovery of the misrepresentation will be excluded from coverage. In other words, once the policy has been rescinded, the professional responds to any claims from injured third parties without coverage.
Here, the policy of professional liability issued to Dr. Stoddard was rescinded due to misrepresentations concerning the extent of his practice in Rhode Island. Those misrepresentations went to his eligibility of insurance through the RIJUA. As a result of the *384 RIJUA’s rescission of the policy, Dr. Stoddard stood without coverage to respond to the DeMarcos’ claim. We have not identified any sound reason to treat medical professionals any differently than other similarly situated professionals. We cannot identify a sound reason to permit reformation of a rescinded professional liability policy to the statutory minimum of $1 million.[6]
We therefore hold that the Appellate Division erred when it resorted to the compulsory automobile liability insurance model rather than the existing rule governing professional liability insurance to fashion a remedy for injured third parties affected by rescission of the medical care provider’s insurance. Having obtained a judgment rescinding the medical malpractice liability policy, the RIJUA owed no duty to defend Dr. Stoddard or to indemnify him in the medical malpractice action pending against Dr. Stoddard in this State.
VII.
The judgment of the Appellate Division is reversed.

 The minimum amount required for the letter of credit is $500,000. N.J.A.C. 13:35-6.18(b).

 In 1997, the Court adopted rules that require firms organized to practice law as professional corporations pursuant to The Professional Service Corporation *376 Act, N.J.S.A. 14A:17-1 to -18, as limited liability companies pursuant to the New Jersey Limited Liability Company Act, N.J.S.A. 14A:2B-1 to -70 (now repealed), or as limited liability partnerships pursuant to the Uniform Partnership Act, N.J.S.A. 42:1A-1 to -56, to obtain and maintain professional liability insurance. R. l:21-lA(a)(3), -1B(a)(4), and -1C(a)(3). Rhode Island has a similar requirement, although the minimum mandatory amount of coverage is different from that in New Jersey. R.I. Gen. Laws § 7-5.1-8.

 Soon thereafter, the OAE sought and obtained the temporary suspension of the member who had discovered but did not curtail the scheme. Id. at 132, 827 A.2d 230.

 On appeal, the Appellate Division held that the coverage was void as to all three members and the firm. Id. at 134, 827 A.2d 230.

 Prior to 2003, such recovery was obtained through the Unsatisfied Claim and Judgment Fund (UCJF). See N.J.S.A. 39:6-64(c). In 2003, the Legislature abolished the UCJF and transferred its claims to PLIGA, which was already administering other types of claims in this State. L. 2003, c. 89, §§ 1, 2, 7.

 We also reject the suggestion that whether the RIJUA actually and reasonably relied on Dr. Stoddard's misrepresentation of the location of his practice is an unresolved issue of fact. Dr. Stoddard had notice of and every opportunity to contest the declarative judgment action. He chose not to do so and a final judgment has been entered granting full relief to the RIJUA.